**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Angela M. Courtland,<br><br>            Plaintiff,<br><br>v.<br><br>GCEP-Surprise, LLC, an Arizona limited liability company; Buffalo Wild Wings International, Inc., a corporation; and Buffalo Wild Wings, Inc., a corporation,<br><br>            Defendants. | No. CV-12-00349-PHX-GMS<br><br>**ORDER** |

      Pending before the Court is Defendants Buffalo Wild Wings, Inc.'s and Buffalo Wild Wings International Inc.'s Motion for Summary Judgment. (Doc. 53.) For the reasons discussed below, Defendants' Motion is granted.[1]

## BACKGROUND

      Plaintiff Angela Courtland worked as a bartender and server at a franchised Buffalo Wild Wings restaurant located in Surprise, Arizona (the "Restaurant") from December 2007 until her termination in November 2009. (Doc. 54, BWWI SOF ¶ 59; Doc. 1 ¶ 6.) Courtland alleges that she was subject to sexual discrimination, harassment,

---

[1] Defendant's request for oral argument is denied because the parties have had an adequate opportunity to discuss the law and evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

and retaliation by the Restaurant's general manager, Mike Marley, and an assistant manager, Josh Buckaloo. (Doc. 1 at 7-9.) She brings Title VII claims against the Restaurant's franchisor, Buffalo Wild Wings, Inc. and Buffalo Wild Wings International Inc. (collectively, "BWWI"), and the franchisee, GCEP-Surprise, LLC ("GCEP").

BWWI maintains a franchising program which includes more than 470 Buffalo Wild Wings restaurants located across the country. (Doc. 54, BWWI SOF ¶ 1.) BWWI also separately owns and operates over 250 restaurants as corporate-owned locations. (*Id.* ¶ 2.) BWWI owns the trademarks and proprietary systems associated with its franchised and corporate-owned restaurants. (*Id.* ¶ 3.) On October 11, 2007, GCEP entered into a Franchise Agreement (the "FA") with BWWI to operate the Restaurant. (*Id.* ¶ 4.) BWWI terminated the FA with GCEP on May 23, 2011. (*Id.* ¶ 92.)

The FA granted GCEP the right to establish the Restaurant and a license to use the Buffalo Wild Wings brand and trademarks in exchange for royalty fees. (Doc. 54-1, Ex. 4 §§ 9(B), (C).)  The FA stated that GCEP and BWWI were independent contractors and that GCEP was an independent business responsible for the control and management of the Restaurant. (*Id.* §§ 6(M), 15(L).) GCEP's responsibilities included the hire, training, discipline, compensation, and termination of all Restaurant employees. (*Id.* § 6(M).) The FA set forth guidelines regarding plant maintenance, product presentation and service, insurance, and use of the BWWI trademark, among other items. (*See* Doc. 54-1, Ex. 4.) BWWI mandated training for the Restaurant's general manager, operational manager, and assistant manager. (*Id.* § 7(B).) The training was directed towards product presentation and service and did not address human resources ("HR") or employment matters. (Doc. 54-2, Ex. 7, Skowronski Depo. at 77-78.) Any supplemental materials regarding employment matters provided by BWWI was merely advisory. (Doc. 54, BWWI SOF ¶ 54.)  BWWI performed periodic evaluations of the Restaurant to ensure compliance with the FA guidelines. (Doc. 54-1, Ex. 4 § 6(G).) The evaluators did not review employee management and had minimal interaction with non-managerial staff. (Doc. 54-2, Ex.7, Skowronski Depo. at 80; Doc. 54-2, Ex. 13, Courtland Depo. at 18-20.)

While working at the Restaurant, Courtland believed she was an employee of BWWI. She attests that she was given on-the-job training by persons who were identified to her as trainers from BWWI's corporate office, and was given an employee handbook that contained the BWWI logo. (Doc. 57, Ex. 1 ¶ 10.) She further states that she was told by her superiors that she was an employee of BWWI. (*Id.* ¶ 3.) Her belief was also based on the fact that the Restaurant was dressed with Buffalo Wild Wings trademarks. (Doc. 54-2, Ex. 13, Courtland Depo. at 22, 39.) However, Courtland was hired, trained on employment matters, supervised, and terminated by Marley. (*Id.* at 18, 22-23, 38-39.)

BWWI moves for summary judgment on all claims. BWWI argues that it cannot be held liable for Courtland's allegations of employment discrimination because BWWI was not Courtland's employer nor was GCEP its agent for purposes of vicarious liability.

## DISCUSSION

### I. LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." In addition, the dispute must be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (internal citations omitted).

Further, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also* LRCiv. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[] forth the specific facts, which the opposing party asserts, including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party."). If the nonmoving party's opposition fails to specifically cite to materials either in the court's record or not in the record, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir. 1988).

**II.   ANALYSIS**

    **A.   Joint employer**

"Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee." *E.E.O.C. v. Pac. Mar. Ass'n*, 351 F.3d 1270, 1275 (9th Cir. 2003) (internal citations omitted). "[B]efore a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id.* at 1277. The Ninth Circuit applies an "economic reality" test to determine the existence of a joint employment relationship. *Brown v. Arizona*, CV-09-2272-PHX-GMS, 2011 WL 2911054 at *2 (D. Ariz. July 20, 2011) (citing *Torres–Lopez v. May,* 111 F.3d 633, 639 (9th Cir. 1997)). All factors relevant to the particular situation must be considered in evaluating the economic reality of an alleged joint employment relationship. *Moreau v. Air Fr.*, 356 F.3d 942, 947 (9th Cir. 2004) (internal quotation marks and citations omitted). For example, the following factors are relevant to this analysis:

(A) The nature and degree of control of the workers; (B) The degree of supervision, direct or indirect, of the work; (C) The power to determine the pay rates [or] the methods of payment of the workers; (D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and (E) Preparation of payroll and the payment of wages.

*Pac. Mar. Ass'n*, 351 F.3d at 1275 (citing *Torres–Lopez,* 111 F.3d at 646).[2] The Supreme Court and several lower courts have considered "the *sine qua non* of determining whether one is an employer [to be] that an 'employer can hire and fire employees, can assign tasks to employees and supervise their performance.'" *Id.* (citing *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 449-50 (2003) and collecting cases). In other words, "[t]he 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.* at 1276-77 (alterations in original and internal citations omitted).

BWWI contends that it was not a joint employer of Courtland because it did not exert control over her employment with the Restaurant.[3] A franchisor is not a joint employer unless it has significant control over the employment relationship. For example, in *Singh v. 7–Eleven, Inc.*, an employee sought to hold liable a franchisor for FLSA violations. No. C–05–04534, 2007 WL 715488 at *3-6 (N.D. Cal. March 8, 2007). The court held that the franchisor was not a joint employer because pursuant to the franchise agreement, the franchisee had "exclusive right and responsibility to control the hiring and firing decision." *Id.* at *4. Further, the franchisor did not compensate employees or exercise control over the terms of employment, including training, assigning job duties,

---

[2] "Because there are no reported cases of this Circuit holding that there is a distinction between joint employment in the FLSA and FMLA contexts and joint employment under anti-discrimination statutes like the ADA and Rehabilitation Act, the Court will apply the same legal framework here." *Brown*, 2011 WL 2911054 at *3.

[3] The Parties agree that BWWI was not Courtland's direct or sole employer. (Doc. 58 at 8.) Courtland also does not argue that BWWI was an indirect employer that performed the alleged discriminatory acts. *See, e.g., Pac. Mar. Ass'n*, 351 F.3d at 1273.

and scheduling. *Id.*; *see also Reese v. Coastal Restoration and Cleaning Services, Inc.*, No. 1:10cv36, 2010 WL 5184841 at *3 (S.D. Miss. Dec. 15, 2010); *Donovan v. Breaker of America, Inc.*, 566 F. Supp. 1016, 1019, 1021 (E.D. Ark. 1983); *Howell v. Chick-Fil-A, Inc.*, No. 92–30188, 1993 WL 603296 at *4-5 (N.D. Fla. Nov. 1, 1993).[4]

Employee and operational supervision does not equate joint employment if the franchisor exercises it for a specific purpose and it is different than the control exercised by an employer. In *Moreau v. Air France,* a franchisor was not found to be the joint employer of ground crew members, despite extensive supervision, specific performance requirements, and rigid quality control. 356 F.3d 942, 951 (9th Cir. 2004). The court found it relevant that the control was exercised to ensure passenger safety and not to control the employment relationship. *Id.*; *see also Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1160 (C.D. Cal. 2003) (franchisor's employees monitored franchisee's employees for quality control but franchisor did not schedule or control shifts, or assign duties); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 688 (D. Md. 2010) (not finding joint employment although franchisor had power to hire and fire technicians, and set schedules and performance standards because it was for quality control). Where courts have found joint employer liability, the franchisor or putative owner has had significant involvement in day-to-day employee management. *See Miller v. D.F. Zee's, Inc.*, 31 F. Supp. 2d 792, 806 (D. Or. 1998); *Torres-Lopez,* 111 F.3d at 637.

---

[4] BWWI relies heavily on *Alberter v. McDonald's Corp.*, 70 F. Supp. 2d 1138 (D. Nev. 1999) to support its argument against joint employer liability. However, the court in that case applied the "single employer" test to determine if two business entities were a single employer. That test is relevant when "separate corporations are not what they appear to be, that in truth they are but divisions or departments of single enterprise." *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 402 (1960). In contrast, the "joint employer" test assumes that the two businesses are separate legal entities and analyzes whether they "co-determine important matters governing the employer-employee relationship." *U.S. Football League Players Ass'n, AFL-CIO v. U.S. Football League*, 650 F. Supp. 12, 15 (D. Or. 1986). Courtland admits that BWWI was not her direct employer and does not argue that BWWI and GCEP are a single enterprise. (Doc. 58 at 8.) As such, the Court will not apply the *Alberter* framework to this case.

BWWI contends that it did not have the right to hire, supervise and fire employees such as Courtland. Courtland does not contest that GCEP was responsible for those decisions regarding non-managerial staff. (Doc. 54, BWWI SOF ¶ 45; Doc. 57, Courtland SOF ¶ 45.) Further, it is undisputed that BWWI did not compensate Restaurant employees and that GCEP was responsible for payroll, scheduling, and employee record-keeping as well as worker's compensation claims and unemployment insurance. (Doc. 54, BWWI SOF ¶¶ 38-43; Doc. 57, Courtland SOF ¶¶ 38-43.) GCEP independently determined how its employees were reviewed, promoted and disciplined. (Doc. 54, BWWI SOF ¶ 46.)

Training was also GCEP's responsibility; BWWI did not train non-managerial staff. (Doc. 54-1, Ex. 4 § 7(A), (B), (C); Doc. 54, BWWI SOF ¶ 44.) In the declaration filed with her Response, Courtland states that she "was given on-the-job training by persons who were identified to [her] as trainers from the [BWWI] corporate office, and was given an employee handbook that had the [BWWI] logo and stated on its cover that it was a [BWWI] 'employee handbook.'" (Doc. 57, Ex. 1 ¶ 10.) However, at her sworn deposition, Courtland repeatedly testified that she never met anyone that she could identify as having worked at BWWI's corporate headquarters and that her supervisor Mike Marley trained her on all HR issues. (Doc. 54-2, Ex. 13 at 18-20, 25-26, 31.) Courtland's controverting declaration does not create a genuine issue of fact as to BWWI's involvement in employee training. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting [her] prior deposition testimony.")

BWWI asserts that it was not involved with HR matters. It is undisputed that BWWI did not provide assistance with respect to HR issues, mandate HR training, or monitor the Restaurant's HR policies. (Doc. 54, BWWI SOF ¶¶ 50-53, 55; Doc. 57, Courtland SOF ¶¶ 50-53, 55.)  To the extent that BWWI provided managerial staff with HR training material, it was provided on an advisory basis. (Doc. 54, BWWI SOF ¶ 54.)

Finally, BWWI contends that it did not influence GCEP's conduct of the

Restaurant's daily operations nor did it share profits with GCEP. The FA states, in relevant part:

> You acknowledge that you are an independent business and responsible for control and management of your Restaurant, including, but not limited to, the hiring and discharging of your employees and setting and paying wages and benefits of your employees. You acknowledge that we have no power, responsibility or liability in respect to the hiring, discharging, setting and paying of wages or related matters.

(Doc. 54-1, Ex. 4 § 6(M).) Although the FA provision is not dispositive, it indicates that GCEP was independently responsible for operations. In the FA, BWWI set forth guidelines regarding plant maintenance, products and operations, liability insurance, indemnification, periodic inspection, and use of the BWWI logo in order to maintain and develop the good will behind its franchise. (*See, e.g.,* Doc. 54-1, Ex. 4 § 5(C), (E), (F), 6(B), (C), (F), (I).) BWWI also had the power to terminate GCEP as a franchisee. However, that supervision "alone is not sufficient to create a joint employment relationship." *Singh*, 2007 WL 715488 at *4 (citing *Evans v. McDonald's Corp.,* 936 F.2d 1087, 1090 (10th Cir. 1991)); *see Zhao,* 247 F. Supp. 2d at 1160; *Jacobson*, 740 F. Supp. 2d at 688; *Moreau,* 356 F.3d at 951. It is further undisputed that GCEP solely managed all investment, financial, and compensation matters. (Doc. 54, BWWI SOF ¶¶ 25-29, 38; Doc. 57, Courtland SOF ¶¶ 25-29, 38.) GCEP was the sole owner and BWWI did not have a financial interest in the Restaurant besides receiving royalty fees for the use of its brand name. (Doc. 54, BWWI SOF ¶¶ 5, 11, 12.)

There is no genuine issue of material fact GCEP had independence in making employment decisions related to Courtland and other staff. The Court concludes as a matter of law that BWWI may not be held liable as a joint employer.

### B.     Vicarious Liability

#### 1.     Agency Relationship

The Ninth Circuit has adopted the agency test for determining when two entities are jointly liable for Title VII violations, under which the determination of whether one

entity is an agent for another is determined based upon traditional rules of agency. *Miller*, 31 F. Supp. 2d at 806 (citing *Kaplan v. Int'l Alliance of Theatrical and Stage Employees of the U.S. and Can.,* 525 F.2d 1354, 1360 (9th Cir. 1975)). "Agency is susceptible of proof as is any other fact and may be established from the circumstances, such as the relation of the parties to each other and to the subject matter, their acts and conduct." *State Farm Mut. Auto. Ins. Co. v. Mendoza*, CIV-02-1141-PHX-ROS, 2006 WL 44376 at *17 (D. Ariz. Jan. 5, 2006) (citing *Phoenix W. Holding Corp. v. Gleeson*, 18 Ariz. 60, 65-66, 500 P.2d 320, 325-26 (App. 1972)). In the franchise context, "an essential element of agency" is the franchisor's right to control the franchisee's actions. *See* Restatement (Third) of Agency § 1.01 cmt. f (2006). "Control is a concept that embraces a wide spectrum of meanings," but within any relationship of agency the principal initially states what the agent shall and shall not do, and has the right to give interim instructions or directions to the agent once their relationship is established. *Id.*

The "predominant test" for holding a franchisor vicariously liable is whether it "controls or has the right to control the daily conduct or operation of the particular 'instrumentality' or aspect of the franchisee's business that is alleged to have caused the harm." *Gray v. McDonald's USA, LLC*, 874 F. Supp. 2d 743, 752 (W.D. Tenn. 2012) (citing *Kerl v. Dennis Rasmussen, Inc.,* 273 Wis. 2d 106, 129 (2004)); *see, e.g., Triplett v. Soleil Grp., Inc.*, 664 F. Supp. 2d 645, 648 (D.S.C. 2009) (internal citation omitted); *Hong Wu v. Dunkin' Donuts, Inc.,* 105 F. Supp. 2d 83 (E.D.N.Y. 2000). This test has been applied in the context of tortious actions committed by a franchisee or its employees. *See Viches v. MLT, Inc.,* 127 F. Supp. 2d 828, 832 (E.D. Mich. 2000) (hotel franchisor not liable for franchisee's negligent use of pesticides); *Viado v. Domino's Pizza, LLC*, 217 P.3d 199, 201, 207 (Or. Ct. App. 2009) (restaurant franchisor not liable for negligent driving of franchisee's employee because franchisor did not have right to control that conduct); *Papasthatis v. Beall*, 150 Ariz. 279, 723 P.2d 97 (App. 1986) (franchisor could be held negligent because franchisor owned the franchisee's property and also selected, recommended, and inspected the soda machine alleged to have caused

the harm). The alleged "instrumentality of harm" in this case is properly characterized as the Restaurant's managerial staff. Courtland bases her Title VII claims on allegations that Mike Marley, the Restaurant's general manager, demoted her from bartender to server because of her pregnancy and ultimately terminated her in retaliation for reporting sexual harassment by an assistant manager, Josh Buckaloo.

Franchisor supervision does not necessarily extend to control over an instrumentality of franchisee harm. In *Kerl*, the Wisconsin Supreme Court explained the significance of operational requirements imposed by a franchisor on a franchisee:

> [B]ecause many franchise relationships include a license to use the franchisor's trade or service mark, the detailed quality and operational standards and inspection rights specified in the franchise agreement are integral to the protection of the franchisor's trade or service mark under the Lanham Act . . . . The premises of vicarious liability weaken when applied to a claim that a franchisor should be held strictly liable for the torts of its franchise[e] [because t]he "control" of a franchisor does not consist of routine, daily supervision and management of the franchisee's business.

273 Wis. 2d at 126. The court sided with the majority view in other jurisdictions that:

> The standardized provisions commonly included in franchise agreements specifying uniform quality, marketing, and operational requirements and a right of inspection do not establish a franchisor's control or right to control the daily operations of the franchisee sufficient to give rise to vicarious liability for all purposes or as a general matter.

*Id.* at 131-32; *see id.* at 127-29 (collecting cases); Restatement (Third) of Agency § 1.01 cmt. f (2006) (stating that the fact that a franchisor "imposes constraints" on a franchisee and sets "standards in an agreement for acceptable service quality" does not of itself create a right of control); *see, e.g., Viches*, 127 F. Supp. 2d at 832 (franchise agreement does nothing more than insure "uniformity and standardization . . . of services"); *Perry v. Burger King Corp.*, 924 F. Supp. 548, 554 (S.D.N.Y. 1996) (restaurant franchisor not vicariously liable for racial discrimination by franchisee because franchise agreement did not provide that franchisor had control over employment matters).

BWWI set out guidelines in the FA in order to promote uniformity among

franchisees and protect its good will. BWWI required GCEP to maintain the Restaurant's plant and signage in a specific manner, use authorized products, ingredients, and vendors, and meet health and safety standards. (Doc. 54-1, Ex. 4 § 5(C), (E), (F), 6(B), (C), (F), (I).) BWWI further reserved the right to perform periodic evaluations and send mystery shoppers to ensure that GCEP was following the FA guidelines. (*Id.* § 6(G).) Courtland testified that representatives from BWWI's corporate office would visit the Restaurant to meet with her managers and that on such occasions: "our managers would make us clean up, get ready, be on your best behavior, and everybody was always nervous to be the person who got chosen to serve that table, because we knew that those were important people." (Doc. 54-2, Ex. 13 at 18-20.) The fact that BWWI maintained strict guidelines as to the presentation and operation of the Restaurant does not establish, without more, that BWWI had control over the Restaurant's managerial staff. *See Kerl,* 273 Wis. 2d at 126 ("The imposition of vicarious liability [on a franchisor] has less effectiveness as an incentive for . . . the exercise of care in the absence of the sort of daily managerial supervision and control of the franchise that could actually bring about improvements.").

Rather, vicarious liability attaches for employment discrimination if the franchisor exerts daily control over the hiring, firing, and supervision of franchisee employees. *See Gray,* 874 F. Supp. 2d at 752 ("No evidence indicates that [the franchisor] had any control over the hiring, firing, or discipline of [the store manager]. [The franchisor] is therefore not vicariously responsible for [the store manager's] tortious conduct."). The facts in *Alberter*, a case involving Title VII claims, are instructive here. As in the present case, plaintiff alleged that the restaurant manager did not take action when a supervisor subjected her to sexual harassment. 70 F. Supp. 2d at 1140. However, the franchisor "did not control day-to-day operations" and "did not have control over employment matters with respect to workers there." *Id.* at 1145. The court further noted that the fact that the franchisor set operational standards and non-binding personnel policies, and could terminate the franchise agreement, "does not establish the requisite degree of control to demonstrate that an agency relationship existed." *Id.* The court concluded that "the

argument that [the franchisor] may be held liable to [plaintiff] for employment discrimination because [the owner] acted as the corporation's agent must . . . fail." *Id.*

BWWI did not have control over the daily conduct of the Restaurant's managerial staff. As discussed *supra* in Section II.A., the FA is indicative of GCEP's independence in employee matters. (Doc. 54-1, Ex. 4 § 6(M).) Although such avowals in a franchise agreement are not dispositive of the agency question, see Restatement (Third) of Agency § 1.02 cmt. a (2006), they are relevant to determine the parties' intentions, see *Alberter*, 70 F. Supp. 2d at 1146. In practice, GCEP had sole responsibility for hiring, training, supervising, scheduling, compensating, reviewing, and terminating employees as well as addressing HR issues or grievances. BWWI's Director of Management Development, Nicole Fuchs, attested that any employment guidance that BWWI provided through training materials was merely advisory and franchisees were not bound to follow it. (Doc. 54-2, Ex. 9, Fuchs Decl. ¶¶ 4-8.) In fact, it is undisputed that if a franchisee or employee contacted BWWI with an HR question, BWWI would refer that person back to the franchisee's HR personnel. (Doc. 54, BWWI SOF ¶ 55; Doc. 57, Courtland SOF ¶ 55.)

Although BWWI provided training to the Restaurant's managerial staff, that training did not pertain to employment matters. Pursuant to the FA, BWWI mandated training for the Restaurant's general manager, operational manager, and assistant manager, based on their experience level. (Doc. 54-1, Ex. 4 § 7(B).) The FA further required such training to be completed by replacement managers. (*Id.*) The FA also reserved BWWI's right to require "ongoing training" as needed. (*Id.* § 7(C).) BWWI's franchise consultant assigned to the Restaurant, Conrad Skowronski, testified that the training covered:

> [E]verything about the Buffalo Wild Wings system as pertains to products that we serve, how to serve it, how to store it, how to present it on a—on our dinnerware, . . . what is involved with our gift card program, what we go over for standards for services times and so forth. They would cover what fears that—alcohol that—is a mandate that we would ask the franchisees to use. They could be covered into how we would like our environment set up in terms of television and sporting events and what

would go on each channels. [sic]

(Doc. 54-2, Ex.7, Skowronski Depo. at 77-78.) Importantly, no training was provided regarding the hire, retention, discipline, compensation, training, or recordkeeping for employees. (*Id.* at 78.) BWWI's employee relations consultant, Megan Lunsford, testified that BWWI "does not dictate any policies, procedures, or behavior of our franchisees" in relation to employment matters. (Doc. 54-2, Ex. 6, Lunsford Depo. at 26.) The extent of BWWI's guidance to franchisees on employment discrimination, including sexual harassment, was to tell them "to follow all federal, state, local regulations and rules." (*Id.* at 79.)

BWWI did not monitor whether Restaurant's managerial staff complied with employment laws or how they supervised their employees. Although the FA allowed for periodic evaluations, they were to ensure compliance with plant maintenance, customer service, and sanitation guidelines. (Doc. 54-2, Ex. 4, FA ¶ 6(G); Doc. 54-2, Ex.7, Skowronski Depo. at 80.) BWWI retained the right to require GCEP to replace the general manager or operational manager if their actions failed "to meet our standards and qualifications" or brought "any of the Trademarks into disrepute . . . or impair . . . your Restaurant's reputation or the goodwill of the Trademarks, your Restaurant or the [BWWI] system." (Doc. 54-1, Ex. 4 § 7(A).) This right must be viewed in the context of BWWI's attention to product presentation and service, and GCEP's independence in employment matters. Moreover, BWWI was not empowered to choose the replacements for those positions. The right did not rise to the level of control over managerial staff. Skowronski testified that if he had witnessed sexual harassment during one of his evaluations, he would have done no more than alert the franchise owner "that something occurred in his restaurant and he needs to investigate and possibly talk to his employment lawyer."[5] (Doc. 54-2, Ex.7, Skowronski Depo. at 80.)

---

[5] Courtland alleges that when Marley did not address her sexual harassment complaints regarding Buckaloo, she met with two BWWI executives, Carolyn Vangelos and Andrew Bayless. (Doc. 1 ¶ 11.) They then conducted an investigation and determined that harassment had occurred, and terminated Buckaloo but did not take action against

The undisputed facts show that BWWI worked with and trained the Restaurant's managerial staff only to the extent necessary to protect its brand name and dictate product presentation. BWWI did not mandate employee-related policies, was not involved in the daily staff management, and did not address employee grievances. Courtland has not created a genuine issue of material fact as to whether Marley, Buckaloo, and other managers had independence in supervising Restaurant employees. Thus, BWWI cannot be held vicariously liable under an agency theory because it did not have control over the "instrumentality of harm" in this case. Summary judgment is granted on this ground.

### 2. **Apparent Authority**

"Apparent authority is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." Restatement (Third) of Agency § 3.03 (2006); *See Ruesga v. Kindred Nursing Centers, L.L.C.*, 215 Ariz. 589, 597, 161 P.3d 1253, 1261 (App. 2007). In other words, apparent authority can never be derived from the acts of the agent alone; the evidence must show that the alleged principal represented another as his agent and that the person who relied upon the manifestation was reasonably justified in doing so. *Reed v. Gershweir*, 160 Ariz. 203, 205, 772 P.2d 26, 28 (App. 1989); *Koven v. Saberdyne Sys., Inc.*, 128 Ariz. 318, 322-23, 625 P.2d 907, 911-12 (App. 1980). "It is firmly established that if the principal's conduct creates apparent authority, the principal is subject to liability for the agent's actions even if the agent was acting for his own purposes." *Miller v. Mason-McDuffie Co. of S. California*, 153 Ariz. 585, 589, 739 P.2d 806, 810 (1987).

---

Marley for ignoring Courtland's complaints. (*Id.* ¶ 12.) However, the evidence shows that the investigation was not conducted by BWWI employees. Courtland testified that Vangelos and Bayless did not tell her nor imply that they were employed by BWWI, (Doc. 54-2, Ex. 13, Courtland Depo. at 27-28) and in fact, Lunsford attested that they were not and have never been employed by BWWI. (Doc. 54-2., Ex. 5, Lunsford Aff. ¶ 3).

BWWI argues that Courtland has not produced evidence that BWWI made any manifestations to led her to believe that it was her employer. Courtland first asserts that BWWI's logos, signage and marketing material at the Restaurant made her believe that she was an employee of BWWI. In her deposition, Courtland testified that she observed that "everything around us [was] Buffalo Wild Wings," and that her understanding of BWWI was "based on the name itself and the buffalo with the wings" and on nothing else. (Doc. 54-2, Ex. 13, Courtland Depo. at 36.) Although the use of a brand name demonstrates a franchise relationship, the existence of a franchise alone does not create an agency. *See Oberlin v. Marlin Am. Corp.*, 596 F.2d 1322, 1327 (7th Cir. 1979). Further, signage and advertising, without more, is not sufficient manifestation by the franchisor to establish apparent agency in this case. *Colson v. Maghami*, CV 08-2150-PHX-MHM, 2010 WL 2744682 at *13 (D. Ariz. July 9, 2010) ("Colson's reliance on . . . brand signage as a means of establishing apparent agency . . . fails to account for the Arizona cases holding that a franchisor's corporate identity does not provide a basis for a finding of apparent agency."); *Am. Motor Sales Corp. v. Sup.Ct.,* 16 Ariz. 494, 494 P.2d 394, 396 (App. 1972) (automobile dealer agreements, advertising and stationary not indicia of agency). It would not be reasonable for Courtland to have relied on signage to infer that BWWI was in fact, her employer.[6]

Courtland points to other representations that led her to believe BWWI was her employer; they are not substantiated by the evidence in the record. She attests that she was provided an "employee handbook" that contained BWWI's logo on the cover. (Doc. 57, Ex. 1 ¶ 10.) However, Courtland has not produced that handbook and even if she had, the presence of the logo would not establish that the handbook was provided by BWWI. The Ninth Circuit has "refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." *Villiarimo v. Aloha Island Air,*

---

[6] Although it is disputed whether there was a sign in the Restaurant identifying it as a franchisee and acknowledging that GCEP independently owned and operated it, (Doc. 54, BWWI SOF ¶ 19; Doc. 57, Courtland SOF ¶ 19), the lack of such notice would not create apparent authority.

- 15 -

*Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citing *Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1481 (9th Cir. 1996) and *Johnson v. Washington Metro. Transit Auth.,* 883 F.2d 125, 128 (D.C. Cir. 1989)). Courtland attests: "I was always told by my superiors that I was an employee of [BWWI], and was never told or given any reason to suspect that my actual employer might be some party other than [BWWI]." (Doc. 57, Ex. 1 ¶ 3.) This uncorroborated statement is not sufficient to create a genuine issue of fact. Courtland does not identify which "superiors" told her that she was a BWWI employee and in what context the statements were made. Further, even if her superiors had made such statements, Courtland does not establish that they are traceable to manifestations by BWWI. Courtland also attests that she was trained at the Restaurant by "persons who were identified to [her] as trainers from the [BWWI] corporate office." (Doc. 57, Ex. 1 ¶ 10.) However, as discussed *supra*, that attestation is contradicted by her earlier testimony, (Doc. 54-2, Ex. 13 at 18-20, 25-26, 31), and thus does not create a genuine issue of fact. *See Kennedy*, 952 F.2d at 266.

To establish apparent authority, Courtland must show not only that she subjectively believed she was employed by BWWI but that her belief was objectively reasonable and based on BWWI's manifestations. *See Myers v. Bennett Law Offices*, 238 F.3d 1068, 1073 (9th Cir. 2001). Courtland attests that she always thought her employer was "the well known established national restaurant chain known as [BWWI]" and she "did not know what a franchise was, and only learned that BWWI might not be the only party liable to me for damages when [she] met with [her] attorney of record, just prior to the filing of this lawsuit." (Doc. 57, Ex. 1 ¶¶ 3-4.) Courtland does not produce evidence that BWWI "intentionally or inadvertently induced" that belief. *See Curran v. Indus. Comm'n of Arizona*, 156 Ariz. 434, 437, 752 P.2d 523, 526 (App. 1988) (internal citation omitted). In fact, the record shows that she ignored indicators that she was employed by GCEP and not BWWI. For example, Courtland provided an employee information card to Amcheck, the payroll services provider for GCEP, and the heading of that card listed "GCEP-Surprise LLC." (Doc. 54-2, Ex. 12.) Courtland's W-2 forms listed "GCEP-

Surprise LLC" as the name of her employer and did not mention BWWI. (Doc. 54-2, Exs. 14, 15.) It is undisputed that she did not inquire regarding the ownership of the Restaurant before her employment was terminated. (Doc. 54, BWWI SOF ¶ 80; Doc. 57, Courtland SOF ¶ 80.) There is no evidence that Courtland reasonably relied upon manifestations by BWWI that it was her employer. Summary judgment is granted on this point.[7]

**CONCLUSION**

Courtland has not shown that there is a genuine issue of material fact as to whether BWWI was her joint employer. There is also no evidence that BWWI may be held vicariously liable for employment discrimination under either a theory of agency or apparent authority.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 53) is **GRANTED**. The Clerk of Court is directed to terminate Defendants Buffalo Wild Wings, Inc. and Buffalo Wild Wings International Inc. from this action.

Dated this 29th day of July, 2013.

*A. Murray Snow*
G. Murray Snow
United States District Judge

---

[7] Courtland points to evidence of BWWI manifestations that she received upon or after the termination of her employment with the Restaurant. She refers to a "Buffalo Wild Wings Performance Counseling Record" containing the BWWI logo in the heading that she was provided upon termination (Doc. 57, Ex. 3), her last paycheck from Amcheck payroll services listing the company name as "BWW Surprise" (*Id.*, Ex. 4), and a response from the Restaurant to her EEOC charge of discrimination containing the BWWI logo and listing the company name as "Buffalo Wild Wings, Surprise" (*Id.*, Ex. 5). However, Courtland may not rely upon this evidence to show apparent authority *during* her employment because she received the documents after termination.